UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAVONDA HAWKINS, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>KELLOGG COMPANY,<br><br>    Defendant. | Case No. 16-cv-0147-JAH (JMA)<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (DOC. # 8)** |

### INTRODUCTION

Pending before the Court is Defendant Kellogg Company's ("Defendant") motion to dismiss Plaintiff Shavonda Hawkins' ("Plaintiff") complaint. (See Doc. # 8). The motion has been fully briefed by the parties. For the reasons set forth below, the Court **GRANTS** Defendant's motion to dismiss and **DISMISSES** Plaintiff's complaint **WITH PREJUDICE**.

### BACKGROUND

Defendant manufactures, distributes, and sells various types of cookies under the brand name Mother's Cookies. (Doc. # 1, ¶¶ 3, 10). Plaintiff is a consumer who has repeatedly purchased Mother's Cookies since January 1, 2008. Id. ¶¶ 8, 11, 64, 95. On January 1, 2016, Plaintiff filed a putative class action lawsuit challenging Defendant's use of partially hydrogenated oil ("PHO") in its cookies. (See Doc. # 1). Plaintiff asserts that PHO is a source of artificial trans fat and that "there is 'no safe level' of PHO or artificial

1  trans fat intake" because PHO and artificial trans fat cause inflammation, heart disease,
2  diabetes, cancer, Alzheimer's disease, and cognitive damage. Id. ¶¶ 4, 16, 17, 54. Plaintiff
3  further asserts that there are safe, economical alternatives to PHO, which Defendant
4  "unfairly" declines to use in its cookies. Id. ¶ 7. As a result of purchasing and consuming
5  Defendant's cookies, Plaintiff contends that she suffered both pecuniary and physical
6  injuries, and thus brought suit against Defendant. Id. ¶¶ 86, 87.

7  In her complaint, Plaintiff asserts claims for: (1) unlawful business practices in
8  violation of California's Unfair Competition Law, California Business and Professions Code
9  §§ 17200, *et seq.* ("UCL"), (2) unfair business practices in violation of the UCL, (3)
10  nuisance in violation of California Civil Code §§ 3479–93, and (4) breach of the implied
11  warranty of merchantability. Id. at 23–28.[1] Plaintiff asserts these claims individually and
12  on behalf of a class of all individuals "who purchased in the United States, on or after
13  January 1, 2008 . . . for household or personal use, Mother's Cookies products
14  manufactured or distributed by Defendant containing partially hydrogenated oil." Id. ¶ 95.
15  Plaintiff's claims are based solely on Defendant's use of PHO; Plaintiff does not assert that
16  the cookies were mislabeled. Id. ¶ 90.

17  On March 17, 2016, Defendant filed a motion to dismiss Plaintiff's complaint,
18  arguing that Plaintiff lacks Article III standing, failed to properly allege any of her claims,
19  and that Plaintiff's claims are preempted by federal law. (See Doc. # 8). Alternatively,
20  Defendant requested the Court dismiss or stay the instant action under the doctrine of
21  primary jurisdiction. Id. at 23–24. Plaintiff filed a response in opposition to Defendant's
22  motion to dismiss on April 25, 2016, and Defendant filed a reply in support of its motion
23  to dismiss on May 2, 2016. (See Docs. # 9, 10). The Court then took Defendant's motion
24  to dismiss under submission pursuant to Civil Local Rule 7.1(d.1). (See Doc. # 11).
25  ///
26  ///
27
28  _____
    [1] Page numbers cited refer to the page numbers assigned by the Court's Electronic Court Filing system.

# LEGAL STANDARD

## A. 12(b)(1)

The federal court is one of limited jurisdiction. Gould v. Mutual Life Ins. Co. of New York, 790 F.2d 769, 774 (9th Cir. 1986). As such, it cannot reach the merits of any dispute until it confirms its own subject matter jurisdiction. Steel Co. v. Citizens for a Better Environ., 523 U.S. 83, 94–95 (1998). Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a defendant may seek to dismiss a complaint for lack of subject matter jurisdiction. When considering a Rule 12(b)(1) motion to dismiss, the district court is "free to hear evidence regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes where necessary." Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983). In such circumstances, "[n]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Id. (citing Thornhill Publ'g Co. v. Gen. Tel. & Elec. Corp., 594 F.2d 730, 733 (9th Cir. 1979)). Plaintiff, as the party seeking to invoke jurisdiction, has the burden of establishing that jurisdiction exists. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).

## B. 12(b)(6)

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a complaint for failure to state a claim for relief.  Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or fails to allege sufficient facts to support a cognizable legal theory. Li v. Kerry, 710 F.3d 995, 999 (9th Cir. 2013).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  In other words, "the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff

1  to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) (citing Iqbal, 556
2  U.S. at 678).  "Determining whether a complaint states a plausible claim for relief will . . .
3  be a context-specific task that requires the reviewing court to draw on its judicial experience
4  and common sense." Iqbal, 556 U.S. at 679.
5        In reviewing a motion to dismiss under Rule 12(b)(6), a court must assume the truth
6  of all factual allegations and construe the factual allegations in the light most favorable to
7  the nonmoving party.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996).
8  However, legal conclusions need not be taken as true merely because they are "cast in the
9  form of factual allegations."  Ileto v. Glock Inc., 349 F.3d 1191, 1200 (9th Cir. 2003).
10 "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual
11 enhancement.'" Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 557).  The court may
12 consider facts alleged in the complaint, documents attached to the complaint, documents
13 relied upon but not attached to the complaint when authenticity is not contested, and
14 matters of which the court takes judicial notice.  Lee v. City of Los Angeles, 250 F.3d 668,
15 688–89 (9th Cir. 2001). If a court determines that a complaint fails to state a claim, the
16 court should grant leave to amend unless it determines that the pleading could not possibly
17 be cured by the allegation of other facts.  Doe v. United States, 58 F.3d 494, 497 (9th Cir.
18 1995).

## DISCUSSION

Defendant argues that Plaintiff's complaint should be dismissed for lack of standing, failure to state any claims, and because Plaintiff's claims are preempted by federal law. The Court will first discuss the federal regulations on the use of PHO in human food. Next, the Court will address whether Plaintiff has Article III standing. Then, the Court will address whether federal law provides a basis for Plaintiff's UCL claims and whether Plaintiff's state law claims are preempted by federal law.

A.    **The Federal Regulatory Scheme on PHO**

In 1906, Congress passed the Pure Food and Drugs Act, "which was the first comprehensive federal legislation designed to protect consumers from fraud or

1 misrepresentation in the sale of food and drugs." Yumul v. Smart Balance, Inc., No. CV
2 10–00927 MMM (AJWx), 2011 WL 1045555, at *6 (C.D. Cal. Mar. 14, 2011) (citing
3 JAMES T. O'REILLY, FOOD AND DRUG ADMINISTRATION § 3:1–13 (3d ed. 2009)). Then, in
4 1938, Congress passed the Food, Drug, and Cosmetic Act ("FDCA") as successor
5 legislation. See Federal Food, Drug, & Cosmetic Act, Pub. L. No. 75–717, 52 Stat. 1040
6 (1938). The FDCA established the Food and Drug Administration ("FDA") within the
7 Department of Health and Human Services and empowered the FDA to protect public
8 health by regulating food safety and labeling. 21 U.S.C. § 393. Specifically, the FDCA
9 requires the FDA to (i) ensure that "foods are safe, wholesome, sanitary, and properly
10 labeled," (ii) promulgate regulations to enforce the provisions of the FDCA, and (iii) enforce
11 its regulations through administrative proceedings. See 21 U.S.C. §§ 371, 393(b)(2)(A); 21
12 C.F.R. § 7.1 et seq.

13 The FDCA also prohibits "[t]he introduction or delivery for introduction into
14 interstate commerce of any food . . . that is adulterated." 21 U.S.C. § 331(a). A food is
15 adulterated "if it . . . contains . . . any food additive that is unsafe within the meaning of"
16 21 U.S.C. § 348.[2] Id. § 342(a)(2)(C)(i). In relevant part, a food additive is deemed unsafe
17 unless there is "a regulation issued . . . prescribing the conditions under which such additive
18 may be safely used," and the additive is used in conformity with the regulation. Id. §
19 348(a)(2). In addition, the FDCA explicitly exempts from the definition of "food additive"
20 foods that are "generally recognized . . . as having been adequately shown through scientific
21 procedures (or, in the case of a substance used in food prior to January 1, 1958, through
22 either scientific procedures or experience based on common use in food) to be safe . . . ."
23 Id. § 321(s). This status is referred to as "Generally Recognized as Safe" or "GRAS." 21
24 C.F.R. § 170.30. Substances that are GRAS may be used in food without FDA approval or
25 review. 21 U.S.C. §§ 321(s), 348(b). The FDA maintains a non-exhaustive list of foods that

---

[2] A food additive is "any substance the intended use of which results . . . in its becoming a component or otherwise affecting the characteristics of any food . . . if such substance is not generally recognized, among experts qualified . . . to evaluate its safety . . . to be safe under the conditions of its intended use." 21 U.S.C. § 321(s).

1  have been deemed GRAS. 21 C.F.R. § 170.30(d). PHOs are not on this list. See 21 C.F.R.
2  Part 184.4.

3  On June 17, 2015, the FDA issued a final determination on the use of PHO in food
4  ("Final Determination"). See Final Determination Regarding Partially Hydrogenated Oils,
5  80 Fed. Reg. 34650 (June 17, 2015). In the Final Determination, the FDA recognized that
6  common PHOs "have been considered GRAS by the food industry based on a history of
7  use prior to 1958," while other PHOs have been deemed GRAS. Id. at 34651. However,
8  the FDA announced that based on current scientific evidence "there is no longer a consensus
9  that PHOs . . . are [GRAS] for use in human food. . . ." Id. at 34669. The FDA set June 18,
10 2018, as a compliance date by which time food producers must have removed PHO from
11 their food products or petitioned for and received approval to use PHO in their products.
12 Id. at 34668. By selecting a compliance date three years in the future, the FDA expressed
13 an intention to "minimiz[e] market disruptions by providing industry sufficient time to
14 identify suitable replacement ingredients for PHOs, to exhaust existing product inventories,
15 and to reformulate . . . affected products." Id. at 34669.

16 Several months later, on December 18, 2015, the President signed into law the
17 Consolidated Appropriations Act of 2016 ("2016 CAA"). Consolidated Appropriations Act,
18 2016, Pub. L. No. 114–113, § 754, 129 Stat. 2242, 2284 (2015). Section 754 of the 2016
19 CAA, which discusses the use of PHO in food and the FDA's Final Determination, states
20 as follows:

> No partially hydrogenated oils as defined in the [Final Determination] shall be deemed unsafe . . . and no food that is introduced or delivered for introduction into interstate commerce that bears or contains a partially hydrogenated oil shall be deemed adulterated . . . by virtue of bearing or containing a partially hydrogenated oil until the compliance date as specified in such order (June 18, 2018).

26 Id.
27 ///
28 ///

1         **B.**       <u>Plaintiff Alleges a Physical Injury Sufficient to Confer Article III Standing</u>

2         Defendant argues that Plaintiff lacks standing to assert this action because her allegations do not establish that she suffered physical or economic injuries. (Doc. # 8, pg. 14–18). First, Defendant argues that Plaintiff's "claim that she may somehow in the future face a . . . higher risk of disease" as a result of eating Defendant's food products is too speculative and conclusory to establish a physical injury. <u>Id.</u> at 16. Second, Defendant argues that Plaintiff did not plausibly allege an economic injury because Plaintiff received "the benefit of the bargain" when she consumed Defendant's cookies, which were not alleged to be mislabeled. <u>Id.</u> at 17–18.

        In opposition, Plaintiff contends that she has standing to bring this action because she sufficiently alleged that, as a result of eating Defendant's cookies, she suffered an increased risk of future injury, an actual injury, and an economic injury. (Doc. # 9, pg. 13–21). In her complaint, Plaintiff alleges that she "suffered physical injury when she repeatedly consumed Defendant's . . . Cookies, because consuming artificial trans fat in *any* quantity, including the quantity she actually consumed, inflames and damages vital organs and substantially increases the risk of heart disease, diabetes, cancer, and death." (Doc. # 1, ¶ 87). Plaintiff argues that this allegation establishes that she was actually injured because she was exposed to trans fat and exposure at any level causes physical harm. (Doc. # 9, pg. 14). Plaintiff also contends that this allegation demonstrates that she faces a credible threat to her physical well-being, which is an injury sufficient to confer standing. <u>Id.</u> at 13–14. Finally, Plaintiff asserts that she suffered an economic injury as a result of purchasing Defendant's cookies because she intended to buy a safe product, but received a dangerous product "not fit for human consumption." <u>Id.</u> at 17–21.

        In reply, Defendant again contends that Plaintiff lacks standing because she did not sufficiently allege a physical or economic injury as a result of eating Defendant's cookies. (Doc. # 10, pg. 6–8). Defendant points to cases in which courts have determined that allegations that trans fat increases the future risk of developing diseases are too speculative to establish standing. <u>Id.</u> at 6–7 (citing <u>McGee v. Diamond Foods Inc.</u>, No. 14-cv-2446,

2016 WL 816003, at *6 (S.D. Cal. Mar. 1, 2016); Simpson v. California Pizza Kitchen, Inc., 989 F. Supp. 2d 1015, 1022 (S.D. Cal. 2013); Hawkins v. Kroger Co., No. 15-cv-2320, Doc. # 19, pg. 7–8 (S.D. Cal. Mar. 17, 2016)). Defendant also asserts that Plaintiff does not sufficiently allege economic injury because food products are purchased with the goal of consumption, therefore Plaintiff received the benefit of the bargain when she consumed Defendant's cookies. (Doc. # 10, pg. 7–8).

Under Article III of the United States Constitution, a federal court may only adjudicate an action if it constitutes a justiciable "case" or a "controversy" that has real consequences for the parties. Raines v. Byrd, 521 U.S. 811, 818 (1997); Lujan v. Defenders of Wildlife, 504 U.S. 555, 559–60 (1992). One of the baseline requirements for justiciability in federal court is that the plaintiff have standing to assert the claims brought. Lujan, 504 U.S. at 560. Plaintiff has the burden of showing that Article III standing exists here. Ellis v. Costco Wholesale Corp., 657 F.3d 970, 978 (9th Cir. 2011). To do so, Plaintiff must establish the following three elements.

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560–61 (quotations and citations omitted). Here, the inquiry centers on the first element of standing—whether Plaintiff suffered an "injury in fact." This is not an exceptionally high threshold. An injury may be minimal. See Preminger v. Peake, 552 F.3d 757, 763 (9th Cir. 2008). Indeed, "an identifiable trifle is enough for standing to fight out a question of principle." United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 689 n. 14 (1973) (citation omitted).

### 1. Potential Future Injury

Plaintiff's main contention is that PHO causes long-term harm. Plaintiff alleges that she is at an increased risk of developing numerous, serious diseases as a result of eating Defendant's cookies due to their PHO content. An allegation of future injury may suffice to establish an injury in fact "if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (citing Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1150 n. 5 (2013)). Plaintiff does not contend that the threatened injuries are certainly impending. (See Doc. # 9, pg. 15 (stating that she is not required "to demonstrate that it is literally certain" that the harms identified will occur)). Plaintiff must then establish an increased risk of harm. To do so, Plaintiff must show "(i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account." Herrington v. Johnson & Johnson Consumer Cos., No. C 09–1597 CW, 2010 WL 3448531, at *3 (N.D. Cal. Sept. 1, 2010) (citation omitted).

Here, Plaintiff alleges that she has "repeatedly" consumed Defendant's cookies since January 1, 2008. (Doc. # 1, ¶ 11). Plaintiff fails to offer additional details on how many times she ate Defendant's cookies. Plaintiff also fails to allege that this mystery level of consumption substantially increased her risk of developing diseases associated with trans fat. Therefore, Plaintiff does not have standing to assert claims based on future harm.

### 2. Actual Physical Injury

Plaintiff also alleges that she suffered an actual injury after consuming Defendant's cookies because consuming PHO "in *any* quantity, including the quantity she actually consumed, inflames and damages vital organs . . . ." (Doc. # 1, ¶ 87). Defendant focuses on future risk rather than addressing whether Plaintiff's allegations of inflammation and organ damage are sufficient to confer standing. (Doc. # 8, pg. 14–16). However, Defendant asserts that various courts, including this Court, have found similar allegations of physical harm too speculative to confer standing. Id.

1    Physical injuries traditionally give rise to an injury in fact. See Covington v. Jefferson
2    Cnty., 358 F.3d 626, 638 (9th Cir. 2004) (finding allegations of physical injuries, including
3    "watering eyes and burning noses" sufficient to establish an injury in fact); Backus v. Gen.
4    Mills, Inc., 122 F. Supp. 3d 909, 919 (N.D. Cal. 2015) (stating that "[a] physical injury is
5    a traditionally recognized injury giving rise to Article III standing"). Construing the factual
6    allegations in the light most favorable to Plaintiff, as the Court must do, the Court finds
7    that Plaintiff's allegations of inflammation and organ damage are "trifles" sufficient to
8    establish an injury in fact for the purposes of Article III standing.
9    The Court notes that this finding appears inconsistent with an opinion previously
10   issued by this Court. See McGee v. Diamond Foods, No. 14-cv-2446, 2016 WL 816003
11   (S.D. Cal. Mar. 1, 2016). However, in McGee, the plaintiff-consumer argued that she had
12   standing based on a physical injury of an "increased risk of disease from consuming trans
13   fat" and an economic injury of purchasing an unhealthy product. McGee v. Diamond Foods,
14   No. 14-cv-2446, Doc. # 8, pg. 13–19 (S.D. Cal. Dec. 8, 2014). The plaintiff-consumer in
15   McGee stated that she had suffered an actual injury of inflammation, but this statement
16   was buried in argument discussing increased risk of future disease as a basis for standing.
17   Id. at 14–15. Therefore, the argument that the plaintiff-consumer suffered an actual injury
18   was not properly raised and vetted in McGee as was done here. Further, the other cases to
19   which Defendant cites are similarly distinguishable because they involved allegations of
20   increased risk of future harm as an injury in fact, rather than actual harm. See Simpson v.
21   California Pizza Kitchen, Inc., 989 F. Supp. 2d 1015, 1022 (S.D. Cal. 2013) (finding that
22   the plaintiff-consumer failed to establish "increased risk of harm"); Hawkins v. Kroger Co.,
23   No. 15-cv-2320, Doc. # 19, pg. 7 (S.D. Cal. Mar. 17, 2016) (relying on Simpson to find
24   allegations of physical harm from consuming trans fat too hypothetical to confer standing).

### 3. Economic Injury

26   Finally, Plaintiff alleges that she suffered an economic injury because she purchased
27   Defendant's cookies, which were less healthy than expected. "[A]n economic injury
28   typically requires a loss of the plaintiff's benefit of the bargain, such as by overpayment,

1 loss in value, or loss of usefulness." Simpson, 989 F. Supp. 2d at 1022. As this Court has previously stated, "consumption is the purpose for which consumers purchase food products." McGee, 2016 WL 816003, at *6. This Court explained that where a consumer purchases a food product with no misleading or false information advertised on the product and then consumes the food product, the consumer has received the benefit of the bargain and suffered no economic injury. Id.

Here, too, Plaintiff alleges that she purchased and consumed Defendant's cookies. (Doc. # 1, ¶ 8). Plaintiff does not allege that Defendant's cookies were mislabeled; instead, she claims she was too busy to read the product's nutrition label. Id. ¶ 90. Therefore, Plaintiff has not alleged an economic injury sufficient to confer Article III standing.

### C. Federal Law Does Not Provide a Basis for Plaintiff's Claim under the Unlawful Prong of Section 17200

Plaintiff alleges that Defendant violated the unlawful prong of section 17200 of the UCL, in part, by using PHO in its cookies. (See Doc. # 1, pg. 23–25). Section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE § 17200. Under the unlawful prong of section 17200, violations of other laws are treated as unlawful practices that are independently actionable under the UCL. See Goldman v. Standard Ins. Co., 341 F.3d 1023, 1036 (9th Cir. 2003). Plaintiff argues that Defendant has violated numerous sections of the FDCA by using PHO in its cookies, and has thus violated the unlawful prong of section 17200. (See Doc. # 1, pg. 24–25). However, as explained below, the Court finds that the current use of PHO in food products does not violate federal law. Therefore, federal law cannot serve as a basis for Plaintiff's claim for violation of the unlawful prong of section 17200.

By choosing June 18, 2018, as the compliance date, the FDA makes evident in the Final Determination that it is not currently unlawful to use PHO in food products. Final Determination Regarding Partially Hydrogenated Oils, 80 Fed. Reg. 34650, 34668 (June 17, 2015). If the FDA intended to make illegal the current use of PHO in food, it is reasonable to expect that the Final Determination would have contained language to that

1  effect. Instead, the Final Determination states that, by offering three years' advanced notice
2  of the compliance date, the FDA intended, in part, to allow affected parties to "exhaust
3  existing product inventories." Id. at 34669. Thus, the Final Determination specifically
4  contemplates and allows for the continued sale of food products that may contain PHO
5  until June 18, 2018.

6  Further, the 2016 CAA explicitly says that foods shall not be considered adulterated
7  based on their PHO content and PHOs shall not be deemed unsafe under the FDCA until
8  June 18, 2018. See Consolidated Appropriations Act, 2016, Pub. L. No. 114–113, § 754,
9  129 Stat. 2242, 2284 (2015). This is a clear step by Congress to preclude parties, like
10 Plaintiff, from bringing suit against food manufacturers based on use of PHO before the
11 compliance date, or, as another court explained it, section 754 is "essentially [Congress's]
12 ratif[ication] [of] the FDA's Final Determination." See Backus v. Nestle USA, Inc., 167 F.
13 Supp. 3d 1068, 1073–74 (N.D. Cal. 2016).

14 Finally, other courts have held that the current use of PHO in food products neither
15 violates federal law nor provides a basis for a claim of unlawful business practices under
16 section 17200. See Backus v. Gen. Mills, Inc., 122 F. Supp. 3d 909, 926–28 (N.D. Cal.
17 2015) (finding that the use of PHO in food products is not currently unlawful under federal
18 law such that federal law "cannot serve as the basis for [the plaintiff's] 'unlawful' UCL
19 claim"); Backus v. ConAgra Foods, Inc., No. C 16–0454 WHA, 2016 WL 3844331, at *2–
20 3 (N.D. Cal. July 15, 2016) (examining federal regulations on the use of PHO and holding
21 that the plaintiff had not plausibly alleged that the sale of food products containing PHO
22 violates federal law, so federal law could not serve as the basis for his "unlawful" section
23 17200 claim).

24 In similar fashion, the Court finds that, even if Plaintiff had established Article III
25 standing, she failed to plausibly allege that Defendant violated federal law by manufacturing
26 and selling cookies that contain PHO. Therefore, Plaintiff's claim for violation of the
27 unlawful prong of section 17200 of the UCL fails to the extent it is premised on alleged
28 violations of federal law.

### D. Plaintiff's State Claims Are Preempted

Defendant contends that Plaintiff's claims are preempted by the 2016 CAA federal law. (Doc. # 8, pg. 18–19). Defendant asserts that section 754 of the 2016 CAA states that foods containing PHO cannot be found unsafe or adulterated under the FDCA until June 18, 2018, and thus allows for the use of PHO in food until that time. Id. Defendant explains that Congress's objective in drafting and passing section 754 was to prevent unnecessary litigation and a disruption in the market in light of the FDA's concerns on use of PHO in food as stated in the Final Determination. Id. Because Plaintiff's claims attempt to "make it *immediately unlawful* for manufacturers to produce or sell products containing PHOs," Defendant argues that Plaintiff's claims directly conflict with the language and objective of section 754. Id. Defendant also contends that Plaintiff's claims contravene the FDA's Final Determination, which purposefully provides three years' notice of the compliance period to minimize market disruptions by allowing affected parties time to use existing product inventory and formulate a new product. Id.

In opposition, Plaintiff argues that her claims are not preempted by federal law. Plaintiff first contends that her claims are not preempted by the FDA's regulatory scheme on PHO because the FDA's Final Determination states that PHOs are not GRAS, so the state regulation of PHO in food does not conflict with the FDA's position. (Doc. # 9, pg. 22). Plaintiff states that the Final Determination says that the FDCA does not preempt state laws prohibiting or limiting PHO use, which Plaintiff asserts demonstrates that her claims are not preempted by the FDA. Id. at 21–22. Next, Plaintiff argues that her claims are not preempted by the 2016 CAA. Id. at 23–25. Plaintiff contends that states have "plenary control" over the regulation of food, and the 2016 CAA does not alter that right. Id. at 23–24. Plaintiff also appears to argue that the 2016 CAA is not retroactive and that, between the time the Final Determination was issued until the 2016 CAA was passed, all but two varieties of PHO were deemed unsafe. Id. at 25. Finally, Plaintiff contends that the 2016 CAA does not create a safe harbor because it does not expressly permit the use of PHO. Id.

In reply, Defendant reasserts that Plaintiff's claims are preempted by the 2016 CAA and the Final Determination, both of which allow for the use of PHOs in food until at least June, 18, 2018. (Doc. # 10, pg. 12). Defendant cites to case law in which claims nearly identical to those asserted by Plaintiff were dismissed as preempted by the 2016 CAA and the Final Determination. Id. at 12–13 (citing Backus v. Nestle USA, Inc.,167 F. Supp. 3d 1068, 1071–74, 1077 (N.D. Cal. 2016)). Finally, Defendant argues that Plaintiff's assertion that the Final Determination says that state and local laws prohibiting or limiting PHO use in food do not conflict with federal law is inapplicable as that particular statement is "not a finding, only a comment, and an ambiguous one at best." (Doc. # 10, pg. 13 (citing Nestle USA, Inc., 167 F. Supp. 3d at 1073)).

Under the Supremacy Clause of the United States Constitution, federal law can preempt and displace state law. See U.S. CONST. art. VI, cl. 2; Ting v. AT & T, 319 F.3d 1126, 1135 (9th Cir. 2003). There are three types of preemption: (1) express preemption,[3] (2) field preemption,[4] and (3) conflict preemption. Ting, 319 F.3d at 1135 (citations omitted); see also Bank of America v. City and County of San Francisco, 309 F.3d 551, 558 (9th Cir. 2002). The latter two types of preemption are often referred to as implied preemption. See Bank of America, 309 F.3d at 558; Aguayo v. U.S. Bank, 653 F.3d 912, 918 (9th Cir. 2011); Donell v. Kowell, 533 F.3d 762, 775 (9th Cir. 2008). This case presents a question of conflict preemption, specifically whether Plaintiff's state claims are barred under that doctrine.

"Conflict preemption is found where 'compliance with both federal and state regulations is a physical impossibility,' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Ting, 319 F.3d at 1136 (citations omitted). When considering whether a state claim is barred by

---

[3] A state law is expressly preempted when "Congress enacts an explicit statutory command that state law be displaced." Ting v. AT & T, 319 F.3d 1126, 1135 (9th Cir. 2003).

[4] "Field preemption exists 'where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation.'" Id. at 1136 (citations omitted).

1 conflict preemption, the Court focuses on Congress's purpose and the goals and policies of
2 the federal law. Id. Additionally, there is a presumption against preemption when the
3 inquiry involves a field that "has been traditionally occupied by the States." De Buono v.
4 NYSA–ILA Med. & Clinical Servs. Fund, 520 U.S. 806, 814 (1997) (quotations and
5 citations omitted); see also Golden Gate Rest. Ass'n v. City and County of San Francisco,
6 546 F.3d 639, 647 (9th Cir. 2008).

7 Because the regulation of health and safety is a field traditionally occupied by states,
8 the presumption against preemption applies. See Medtronic, Inc. v. Lohr, 518 U.S. 470,
9 475 (1996) (regulation of health and safety matters is a field traditionally occupied by
10 states); accord Chem. Specialties Mfrs. Ass'n v. Allenby, 958 F.2d 941, 943 (9th Cir. 1992).
11 Nonetheless, the Court finds the presumption overcome and Plaintiff's state law claims
12 barred under the doctrine of conflict preemption.

13 All of Plaintiff's state claims are premised on Defendant's use of PHO in its cookies.
14 As Defendant aptly explains, Plaintiff's claims are an attempt to make it "immediately
15 unlawful" under California law to market or sell any food product that contains PHO. (Doc.
16 # 8, pg. 19). However, the FDA considered and rejected recommendations that the Final
17 Determination should be effective immediately. Final Determination Regarding Partially
18 Hydrogenated Oils, 80 Fed. Reg. 34650, 34668 (June 17, 2015). Instead, the FDA selected
19 a compliance date three years in the future so affected parties could petition for and receive
20 approval from the FDA to use PHO in their products, or exhaust current inventory of food
21 products that may contain PHO and create new products sans PHO. Id. at 34668–69. By
22 providing advance notice of the compliance date, the FDA hoped to minimize market
23 disruptions. Id. Here, allowing Plaintiff's remaining state claims to go forward would
24 contravene the FDA's regulatory scheme on the current use of PHO in food products and
25 directly impede the goals and objectives of that scheme. It would seriously disrupt the
26 market by causing food manufacturers to immediately throw out all existing products
27 containing PHO without affording manufacturers time to reformulate the products, find
28

1  alternative ingredients to PHO, and manufacture the revamped products. These are
2  consequences that the FDA explicitly sought to avoid.

3  Additionally, allowing Plaintiff to proceed on her state claims would contravene
4  Congress's purpose in passing section 754 of the 2016 CAA, which was to prevent economic
5  disruption and preclude lawsuits against food producers based on PHO content until the
6  compliance date set forth in the Final Determination. This purpose is demonstrated in
7  legislative overviews of the 2016 CAA, which state that section 754 was drafted in response
8  to concerns of market interference and is meant to prevent "frivolous lawsuits."[5] The Court
9  finds that Plaintiff's current action is one of the frivolous suits that Congress meant to
10 preclude until 2018.

11 The Court finds unavailing Plaintiff's arguments that the 2016 CAA has no bearing
12 on her claims because it "does not purport to be retroactive." (See Doc. # 9, pg. 25). First,
13 Plaintiff filed her complaint *after* the 2016 CAA was signed into law. Second, Plaintiff
14 misrepresents that the FDA had "deemed all but two varieties of PHO to be unsafe" when
15 it issued the Final Determination on June 17, 2015. Id. Instead, the FDA stated that there
16 was no longer a consensus among experts that PHOs are GRAS for use in food and invited
17 parties to submit food additive petitions proposing safe conditions of use of PHO in foods.
18 Final Determination Regarding Partially Hydrogenated Oils, 80 Fed. Reg. 34650, 34657,
19 34669 (June 17, 2015). Also problematic is the fact that Plaintiff contends that two types

---

[5] See H.R. REP. NO. 114–205, at 71 (2015) (stating concerns of "economic disruption in the marketplace and . . . unnecessary litigation" surrounding the use of PHO in food in light of the Final Determination); FY 2016 Omnibus Summary – Agriculture Appropriations, HOUSE APPROPRIATIONS COMMITTEE, *available at* http://appropriations.house.gov/uploadedfiles/12.15.15_fy_2016_omnibus_-_agriculture_-_summary.pdf (last visited Nov. 1, 2016) (stating that "[t]he legislation includes several policy provisions, including . . . [a] provision to amend FDA policy relating to the regulatory treatment of partially hydrogenated oils so that the baking industries and small businesses are not subject to frivolous lawsuits"); see also Legislative Digest, Dec. 18, 2015, REPUBLICAN POLICY COMMITTEE, *available at* https://policy.house.gov/legislative/legislative-digest/friday-december-18-2015 (last visited Nov. 1, 2016) (stating that "the omnibus . . . amends an FDA policy relating to the regulatory treatment of partially hydrogenated oils to prevent frivolous lawsuits").

of PHO were safe while others were not, but fails to identify which PHOs are safe and which PHOs are in Defendant's cookies.

For several reasons, the Court also finds unpersuasive Plaintiff's argument that her claims do not conflict with the FDA's regulatory scheme on PHO use because the Final Determination states that the FDCA does not preempt local and state laws limiting or banning the use of PHOs in food and state and local laws limiting PHO use in food are not likely to conflict with federal law. (See Doc. # 9, pg. 22). First, in making this argument, Plaintiff offered a misleading and doctored quote from the Final Determination. The FDA actually "decline[d] to take a position regarding the potential for implied preemptive effect of this order on any specific state or local law; as such matters must be analyzed with respect to the specific relationship between the state or local law and the federal law." Final Determination Regarding Partially Hydrogenated Oils, 80 Fed. Reg. 34650, 34655 (June 17, 2015). While the FDA noted its belief that local and state laws on use of PHO in food would not conflict with federal law, the FDA nonetheless stated that any state or local law conflicting with a federal law or frustrating federal objectives would be preempted. See id. Therefore, the Final Determination does not state what Plaintiff would have this Court believe it states. Second, the FDA's comment was "not a finding;" rather, it was "only a comment, and an ambiguous one at best." Backus v. Nestle USA, Inc., 167 F. Supp. 3d 1068, 1073, 1077 (N.D. Cal. 2016). The FDA did not specify what types of local or state laws it was referencing and ultimately declined to take a position on the preemptive effect of the Final Determination. Finally, Plaintiff offers no state or local statutes prohibiting the use of PHO in food to which this comment may refer.

Because Plaintiff's claims stand as a direct obstacle to the FDA's objective to minimize market disruptions by providing three years' notice of the compliance date on use of PHO in food and Congress's objective to bolster the FDA's Final Determination through the passage of section 754 of the 2016 CAA, Plaintiff's remaining state claims are barred by conflict preemption. In making this determination, the Court joins with other courts which have dismissed nearly identical claims based on preemption. See Nestle USA,

1  Inc.,167 F. Supp. 3d at 1071–74, 1077 (finding that the plaintiff's state law claims,
2  premised on defendant's use of PHO in its food product, were preempted by the Final
3  Determination and the 2016 CAA, and dismissing the claims without leave to amend);
4  accord Backus v. ConAgra Foods, Inc., No. C 16–0454 WHA, 2016 WL 3844331, at *3–
5  4 (N.D. Cal. July 15, 2016).

## CONCLUSION AND ORDER

The Court finds that Defendant's motion to dismiss should be granted because Plaintiff's claims fail to the extent they are premised on federal law and Plaintiff's state claims are preempted. As such, the Court need not address Defendant's additional arguments. Accordingly, based on the foregoing, **IT IS HEREBY ORDERED** that Defendant's motion to dismiss (Doc. # 8) is **GRANTED** and Plaintiff's complaint is **DISMISSED WITHOUT LEAVE TO AMEND**.

Dated:  December 13, 2016

_____
JOHN A. HOUSTON
United States District Judge